**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:19-CR-193 |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| JHORDAN D. ROYAL, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

Defendant Jhordan D. Royal moves the court to suppress evidence obtained

during the search of a residence without a search warrant.  For the following

reasons, we will deny the motion.

**I.     Factual Background & Procedural History**[1]

On May 24, 2018, Royal was arrested by Harrisburg police officers who were

conducting surveillance in the 200 block of Calder Street.  (See Doc. 69 ¶¶ 1, 11).

Detective Nicholas Ishman led a team of vice unit officers and street crimes officers

to surveil that area of Calder Street to combat street-level drug trafficking.  (See

Doc. 87 Tr. 4:19-5:13).  Undercover officers who witnessed drug deals take place

would approach the purchasers "with the intent to flip them" and then send them

---

[1] The following factual narrative derives from testimonial, documentary, and
audio evidence adduced during the suppression hearing in this matter, together
with the parties' briefing.  The July 23, 2021 transcript is partially sealed.  (See
Docs. 86, 87).  Thus, citations to the July 23, 2021 hearing transcript are abbreviated
as "Doc. ___ Tr. ___."  Citations to the May 24, 2018 audio recording from
Harrisburg Police are abbreviated as "5/24/18 Rec. __."  Hearing exhibits are cited
as "Gov't Ex. __." This recitation of facts reflects the court's credibility
determinations.  We find the testimony of Detective Ishman and Parole Officer
Cutter to be credible.  We do not credit the testimony of Maurice Horton regarding
Royal's possession of a firearm.

back to make controlled purchases. (See id. at 7:3-18). But "if any kind of gun showed up" in the hands of a person the police knew was not lawfully authorized to possess a firearm, the detail was instructed to stop all other activities and focus on the firearm. (See id. at 11:7-15).

An audio recording of the day's events confirms this law enforcement approach. During the first 90 seconds of the recording, several officers, including Detective Ishman, discuss a contemporaneous drug deal and are attempting to identify purchasers and dealers. (See 5/24/18 Rec. 00:00-01:33). Around the one-minute mark, Detective Ishman states "Jhordan has come home," and notes Royal was with another man in a blue Ford Explorer parked right outside Detective Ishman's surveillance spot. (See id. at 1:03-1:11). During the hearing, Detective Ishman explained that, while he did not know Royal to live in the area, he was frequently present on that street. (See Doc. 87 Tr. 13:17-14:1). Detective Ishman further explained that the Ford Explorer was about eight to twelve feet away from where he was conducting surveillance, and he had a clear line of sight to Royal as Royal exited the passenger side of the vehicle and walked across the street. (See id. at 8:19-9:12, 19:3-18).

Detective Ishman testified that he personally observed Royal return to the Explorer, open the driver-side door, reach under the passenger seat of the vehicle, retrieve a silver and black handgun, and place it in his waistband. (See id. at 10:17-22). Detective Ishman knew Royal was not permitted to possess a firearm, and he radioed officers to provide Royal's location and description. (See id. at 10:23-11:6). The audio recording mirrors this testimony. As another officer identifies a drug

2

purchase over the radio, Detective Ishman states "Alright, scratch that. Jhordan Royal just put a gun down his pants." (See 5/24/18 Rec. 1:33-1:38). He further advises that Royal is a "former felon," and provides Royal's location and physical description as Royal walks away from the Explorer and back toward Susquehanna Street. (See id. at 1:38-2:11).

Probation Officer Bruce Cutter was stationed nearby as part of the joint operation, and also knew Royal from previous interactions. (See Doc. 86 Tr. 4:24-5:5, 13:13-14:4). Officer Cutter and his partner heard Detective Ishman's radio call and drove to the location in their unmarked vehicle, turning down Susquehanna Street against the flow of traffic. (See id. at 6:2-7:3). According to Officer Cutter, when Royal saw the vehicle turn the wrong way onto Susquehanna Street, he pulled his tank top down over the firearm in his waistband, making its outline more visible. (See id. at 8:4-13). The vehicle stopped slightly in front of Royal, and a uniformed Officer Cutter exited from the passenger side, drew his firearm at Royal, and told him to stop. (See id. at 8:17-9:2). By this time, Officer Cutter estimated Royal was "four feet from the front steps" leading to the porch and door of 1332 Susquehanna Street. (See id. at 9:3-5). Detective Ishman testified 1332 Susquehanna Street was a "hangout spot" where multiple people would convene on the porch. (See Doc. 87 Tr. 14:24-15:6).

Royal ignored Officer Cutter's command to stop. (See Doc. 86 Tr. 9:6-9:8). He instead proceeded up the front steps, over a baby gate, and into the front door as Officer Cutter followed him and continued to command that Royal stop. (See id. at 9:7-15). Detective Ishman, still at his surveillance point, saw Royal "in front of" or

3

"on the steps of" the porch at 1332 Susquehanna Street.  (See Doc. 87 Tr. 38:4-

38:16).  Detective Ishman observed Royal "run into the house" as soon as the

unmarked police car doors opened.  (See id. at 33:8-34:3, 37:21-38:3).  Detective

Ishman's report confirms that as soon as "fully uniformed officers exited their

vehicles and attempted to arrest Royal," he "immediately ran into 1332

Susquehanna Street."  (See Gov't Ex. 1 at 8).

Seconds after Royal entered the house and shut the door behind him, Officer

Cutter also ascended the steps, pushed the door open, walked inside, and began

calling out for Royal to "come out with his hands up."  (See Doc. 86 Tr. 9:10-25,

10:16-25).  The interior of the residence was comprised of a front hallway with steps

leading upstairs, and open entryways into the first floor living area, dining area, and

kitchen.  (See id. at 15:21-17:2; Gov't Exs. 8, 9).  Officer Cutter then saw Royal's

"head pop up towards the rear of the residence" between the kitchen and dining

room.  (See Doc. 86 Tr. 11:6-15).  As Officer Cutter "continued to give [Royal] loud

verbal commands" from the hallway, Royal eventually moved from his initial

location to the front hallway and dropped to his knees.  (See id. at 11:15-12:12).

Officer Cutter subdued Royal in the front hallway and realized the firearm was no

longer on Royal's person.   (See id. at 12:6-24).

Officer Cutter continued to train his weapon toward the interior of the house,

as he did not know if anyone else was inside 1332 Susquehanna Street other than

himself and Royal.  (See id. at 12:25-13:12).  The audio recording indicates other

officers entered the residence to assist Officer Cutter, and one officer states "We

need one more here, we gotta make sure there's nobody else in this house."  (See

4

5/24/18 Rec. 2:20-2:30, 3:04-3:15).  As the officers "cleared the residence" to ensure no one else was inside, a black and silver handgun was discovered on the stairs leading from the first floor down to the basement.  (See Doc. 86 Tr. 23:4-7, 17:18-18:9; Gov't Ex. 1 at 5).  On the audio recording, an officer states "He threw his gun down the basement right here, we found it."  (See 5/24/18 Rec. 3:28-3:32).  The end of the audio confirms that officers soon realized 1332 Susquehanna Street was not Royal's house.  (See id. at 3:42-3:46).  Officers also discovered a cigarette box that contained suspected crack cocaine and heroin in Royal's "flight path" on the front porch.  (See Gov't Ex. 1 at 5).

Although officers did not locate anyone inside the residence, several other individuals were on the porch and front steps of 1332 Susquehanna Street as Royal's arrest unfolded.  Officer Cutter passed the residence's then-owner Carmen Marshall and her granddaughter on the porch as he entered the residence.  (See Doc. 86 Tr. 9:15-20).  Marshall and Royal were friends—Royal knew Marshall's son, and would stop by and "check up on" Marshall from time to time, bring her food, help her with the children she cared for, and keep people off her porch.  (See id. at 26:21-27:15, 29:5-25).  Marshall allowed Royal to keep headphones at the residence, but "no clothing, no keys to the house."  (See id. at 30:15-18).  Royal did not reside there; he asked for permission to enter the residence whenever he visited; he did not have permission to enter the residence when Marshall was not there; he never spent the night; and he never stayed more than 20 minutes at a time.  (See id. at 27:2-25).  On the day of Royal's arrest at 1332 Susquehanna Street, Marshall

recalled Royal did *not* ask for her permission to enter the house.  (See id. at 28:2-16).

Instead, he simply climbed the steps, said "excuse me," and went inside.  (See id.)

Maurice Horton, a longtime friend of Royal's, was also outside 1332

Susquehanna Street that morning.  (See id. at 38:7-22, 39:18-22).  Horton was sitting

on the steps leading to the porch, talking and smoking either cigarettes or

marijuana.  (See id. at 45:9-19).  Horton testified that Marshall, Royal, and Horton's

friend "Bro" were all in the front porch area.  (See id. at 44:11-45:11).  Like Royal,

Horton was allowed to go into 1332 Susquehanna Street if Marshall gave him

permission.  (See id. at 41:20-24).  According to Horton, on the morning of Royal's

arrest, Royal was standing in the doorway of the residence as the group was talking,

and Royal did not have a gun.  (See id. at 41:10-16, 43:5-9, 46:24-47:11).  Horton then

noticed a "big black truck" driving the wrong way down Susquehanna Street.  (See

id. at 40:11-41:3).  Horton recalled that Royal was already on the porch and at the

doorway as officers exited the vehicle and "stormed the crib."  (See id. at 46:24-

47:21).  As officers entered the residence, Horton stood up, walked away from 1332

Susquehanna Street, and did not witness any other events take place.  (See id. at

42:17-43:4).

In June 2019, a federal grand jury returned a three-count indictment

charging Royal with possession with intent to distribute heroin and cocaine base, 21

U.S.C. § 841(a) (Count 1); possession of a firearm by a convicted felon, 18 U.S.C.

§ 922(g) (Count 2); and possession of a firearm in furtherance of a drug-trafficking

crime, 18 U.S.C. § 924(c) (Count 3).  Royal subsequently moved, through appointed

counsel, to suppress evidence recovered from 1332 Susquehanna Street.  On July

23, 2021, the court held a suppression hearing.  Following the hearing, defense

counsel submitted supplemental briefing, and the motion is now fully briefed and

ripe for disposition.

## II.     Discussion

Royal argues that the officers' entry into 1332 Susquehanna Street was not

authorized by exigent circumstances and that a warrant was required.  The

government responds that exigent circumstances existed and also claims Royal has

no standing to contest the entry because he lacks a privacy interest in the residence.

We first address the threshold standing issue.

### A.     Privacy Interest in 1332 Susquehanna Street

The Fourth Amendment guarantees the "right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and

seizures."  U.S. CONST. amend. IV.  Fourth Amendment analysis traditionally begins

with examining whether the defendant possessed a reasonable expectation of

privacy in the object or place being searched.  See Kyllo v. United States, 533 U.S.

27, 27-28 (2001); Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J.,

concurring).  An individual who lacks a reasonable expectation of privacy in a place

cannot invoke Fourth Amendment protection.  See United States v. Perez, 280 F.3d

318, 337 (3d Cir. 2002).  When the property or area searched "is in the control of a

third party," an individual lacks a reasonable expectation of privacy in that

property or area.  Gov't Virgin Islands v. Williams, 739 F.2d 936, 938 (3d Cir. 1984)

(citing Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)).  In other words, a defendant

aggrieved by the introduction of damaging evidence obtained from an illegal search

of a third party's property or premises suffers no Fourth Amendment infringement. Rakas, 439 U.S. at 133-34; United States v. Baker, 221 F.3d 438, 442 (3d Cir. 2000). A defendant must show both that he *subjectively* had an expectation of privacy in the place or property searched, and that society *objectively* would accept that expectation as reasonable. See Rakas, 439 U.S. at 143 & n.12; United States v. Donohue, 764 F.3d 293, 298-99 (3d Cir. 2014).

Overnight guests "legitimately" in a third-party's home may have a reasonable expectation of privacy therein. Perez, 280 F.3d at 337 (citing Minnesota v. Olson, 495 U.S. 91, 98-99 (1990)). The law distinguishes between overnight guests (who reasonably expect a degree of privacy) and transient visitors at a third party's property (who do not). See Minnesota v. Carter, 525 U.S. 83, 90 (1998); see also United States v. Rose, 613 F. App'x 125, 129 (3d Cir. 2015) (nonprecedential) (holding no expectation of privacy for a social guest at the apartment of a longtime friend). In most cases, a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home." Olson, 495 U.S. at 96-97. Several factors guide this assessment, including, *inter alia*, whether and how often the person spent the night, whether the person had a key, whether the person received mail at the property, whether the person could exclude others from the property, and whether the person stored personal belongings or overnight accoutrements in the place. See, e.g., United States v. Pettiway, 429 F. App'x 132, 133 (3d Cir. 2011) (nonprecedential); United States v. Edwards, No. 11-735, 2013 WL 2256125, at *10 (E.D. Pa. May 23, 2013); United States v. Mitchell, No. 10-CR-114, 2010 WL 3938235, at *4 (M.D. Pa. Oct. 4, 2010). When weighing the reasonableness

of a person's expectation of privacy in a third-party residence, courts may also consider whether the defendant's presence on the property was "wrongful." See United States v. Cortez-Dutrieville, 743 F.3d 881, 884-85 (3d Cir. 2014) (citing Rakas, 439 U.S. at 143 n.12); United States v. Lewis, 666 F. App'x 173, 176 (3d Cir. 2016) (nonprecedential) (defendant who challenged search of residence owned by "long-time friend" where he was found had not identified Fourth Amendment violation, because he "did not have permission" to be in residence when arrested).

In the matter *sub judice*, Royal lacks most of the indicia used to traditionally assert a privacy interest in property owned by a third party. Royal was never an overnight guest of Marshall. Cf. Olson, 495 U.S. at 98-99. Royal did not possess a key to the residence. See Rose, 613 F. App'x at 129 (citation omitted). Nor did he receive mail at the residence or leave clothing there. See id. (citations omitted); Pettiway, 429 F. App'x at 133. Furthermore, Royal required Marshall's permission to enter the residence whenever he visited, did not have permission to enter when Marshall was gone, and never stayed more than 20 minutes at a time. See Rose, 613 F. App'x at 129 (citation omitted). Finally, Royal's presence in the residence at the time of his arrest was wrongful. See Lewis, 666 F. App'x at 176. Marshall testified that, although Royal needed her permission to enter the residence, Royal did not request her permission on the day of his arrest. (See Doc. 86 Tr. 27:22-28:16).

Royal argues that he had a reasonable expectation of privacy because a "spectrum of possessory interests" exists under Third Circuit jurisprudence. (See Doc. 89 at 11 (citing Rose, 613 F. App'x at 129)). In support of this theory, Royal notes that officers "believed they were entering [] Royal's home," that Royal

9

brought food to Marshall and assisted her with childcare, and that he "was a protector of the home" because he kept people off Marshall's porch. (Id.) The sole case cited by Royal in support of this position, however, declined to recognize Fourth Amendment rights "on the spectrum between 'overnight guest' and 'merely present with the consent of the householder.'" See Rose, 613 F. App'x at 129. We too decline to break new Fourth Amendment ground based on Royal's purported status as a "protector" of the front porch. Royal's connection with 1332 Susquehanna Street did not rise to the level of an overnight guest. See Olson, 495 U.S. at 98-99. Royal could only enter the residence "with the consent of the householder," see Carter, 525 U.S. at 90, and on the day in question, he lacked even that consent. In light of the above analysis, the court concludes Royal lacked a reasonable expectation of privacy in 1332 Susquehanna Street, and we will deny the motion to suppress. See Rakas, 439 U.S. at 143 & n.12. In the exercise of caution, we will address alternative grounds for the court's decision.

### B.    Exceptions to Warrant Requirement

Assuming *arguendo* Royal did have a reasonable expectation of privacy in 1332 Susquehanna Street, the officers' limited entry inside the residence and their protective sweep were reasonable. Royal argues the facts surrounding his arrest did not constitute an emergency. (See Doc. 70 at 4). His argument lacks merit.

A warrantless search or seizure inside the home is *per se* unreasonable, with a few exceptions. See United States v. Coles, 437 F.3d 361, 365 (3d Cir. 2006) (quoting Steagald v. United States, 451 U.S. 204, 211 (1981)). If "probable cause and exigent circumstances" exist, however, then the intrusion may be justified. Id. at

10

366.  Examples of exigent circumstances include, *inter alia*, hot pursuit of a suspected felon, see United States v. Santana, 427 U.S. 38, 42 (1976); the possibility that evidence may be removed or destroyed, see Kentucky v. King, 563 U.S. 452, 460 (2011); and danger to the lives of officers or others, see Warden v. Hayden, 387 U.S. 294, 298-99 (1967).  If exigent circumstances are present, "the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." Coles, 437 F.3d at 366 (citing Warden, 387 U.S. at 298-99).  The court uses an objective, totality-of-the-circumstances analysis, reviewing facts and information "available to the officers at the time." See Estate of Smith v. Marasco, 430 F.3d 140, 144 (3d Cir. 2005).  The government bears the burden of proof.  See United States v. Mallory, 765 F.3d 373, 383 (3d Cir. 2014).

The facts of Santana help illustrate the exigency principle.  After officers executed an undercover drug buy, the arrested dealer stated that a woman named Santana had the buy money at a house a few blocks away.  See Santana, 427 U.S. at 39-40.  When police pulled up to the house and shouted "police" as they exited the vehicle, Santana, who had been "standing in the doorway of the house," retreated inside. Id. at 40-41.  Police followed inside and arrested her, finding drugs and the buy money on her person.  Id.  The United States Supreme Court found no Fourth Amendment violation, noting police were "in hot pursuit" and concluding "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." Id. at 42, 43 (citing Hayden, 387 U.S. at 298).

11

We find that law enforcement officers: (1) possessed probable cause and (2) faced exigent circumstances. See Coles, 437 F.3d at 365-66. Upon hearing Detective Ishman's radio communication that "Jhordan Royal just put a gun down his pants" and that he was a "former felon," officers possessed probable cause to arrest Royal for a felony. (See 5/24/18 Rec. 1:33-1:38, 1:45-50). Officer Cutter and his partner, hearing the radio call, immediately drove to the area and turned down Susquehanna Street against the flow of traffic. (See Doc. 86 Tr. 6:2-7:3). Officer Cutter testified that Royal saw the vehicle while he was in the yard, pulled his shirt down over the firearm, ignored Officer Cutter as he exited the vehicle and commanded Royal to stop, and fled inside. (See id. at 8:6-9:15). Detective Ishman's report and in-court testimony confirm that he also observed Royal "run into the house" as soon as Officer Cutter exited his vehicle. (See Doc. 87 Tr. 33:8-34:3, 37:21-38:3; see also Gov't Ex. 1 at 8). Thus, much like the defendant in Santana, Royal could not "defeat an arrest" that Officer Cutter set in motion while Royal was outside by "escaping" into the residence of 1332 Susquehanna Street. See Santana, 427 U.S. at 42, 43; see also Hayden, 387 U.S. at 299 (exigencies of situation allowed officers to follow armed robbery suspect into residence without warrant minutes after he entered).

If officers make a lawful arrest inside a residence, they may also conduct a "protective sweep" of the premises incident to arrest. See Maryland v. Buie, 494 U.S. 325, 334 (1990). The Supreme Court explained:

12

> We [] hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.  Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

Id.; see United States v. White, 748 F.3d 507, 511 (3d Cir. 2014).  Our court of appeals splits this holding into two prongs: under Buie prong one, police may conduct a warrantless search incident to arrest that occurs inside the home, but it is limited to areas "immediately adjoining the place of arrest."  White, 748 F.3d at 511.  Under Buie prong two, police may conduct a warrantless search of other areas of a home when they possess reasonable suspicion that the areas searched may yield discovery of a person "who poses a danger to those present."  Id.  Under either prong, the protective sweep must constitute "only a cursory inspection of those spaces where a person may be found," and must last "no longer than is necessary to dispel the reasonable suspicion of danger."  See Buie, 494 U.S. at 334-35.

We find that police possessed reasonable suspicion under Buie prong two to conduct a protective sweep of the residence after arresting Royal.  See White, 748 F.3d at 511.  It is undisputed that, as Officer Cutter exited his vehicle and commanded Royal to stop, multiple other individuals were on the front porch of 1332 Susquehanna Street, including Marshall, her granddaughter, Horton, and Horton's friend.  (See Doc. 86 Tr. 9:14-17, 28:2-10, 39:18-40:5, 44:11-45:11).  The residence was also known to law enforcement as a "hangout spot" for locals.  (See

Doc. 87 Tr. 14:24-15:6).  Officer Cutter further testified that as he subdued Royal in

the front hallway, he realized Royal was no longer in possession of the firearm that

had been in his waistband.  (See Doc. 86 Tr. 12:6-24).  At that point, officers

possessed articulable facts sufficient to raise the inferences that (1) multiple other

individuals could be inside the house and (2) said individuals could be in possession

of the weapon Royal possessed as he fled inside.  See Buie, 494 U.S. at 334.  Indeed,

the audio recording confirms that, as other officers arrived to assist, one states "We

gotta make sure there's nobody else in this house."  (See 5/24/18 Rec. 3:04-3:10).

We also conclude that the protective sweep of 1332 Susquehanna Street

constituted a "cursory inspection" to dispel the officers' suspicions.  See Buie, 494

U.S. at 334.  The firearm was recovered in plain view on the basement steps,

adjacent to the area from which Royal emerged in response to Officer Cutter's

commands.  (See Gov't Exs. 10-14).  Furthermore, less than 30 seconds pass

between the admonition that officers needed to secure the residence and an

officer's statement "He threw his gun down the basement right here, we found it."

(See 5/24/18 Rec. 3:28-3:32).

In light of the above analysis, we hold that exigent circumstances authorized

the officers' initial entrance into 1332 Susquehanna Street to continue their pursuit

of Royal, whom officers had probable cause to believe had committed a felony.

After Officer Cutter realized the firearm was no longer on Royal's person, officers

possessed reasonable suspicion sufficient to conduct a protective sweep.  Their

actions in arresting Royal and securing the residence did not violate the Fourth

Amendment.

**III.**   **Conclusion**

We will deny Royal's motion (Doc. 69) to suppress evidence because he has

failed to identify a protectable Fourth Amendment interest in 1332 Susquehanna

Street.  Assuming Royal possessed a reasonable expectation of privacy, we find that

exigent circumstances allowed law enforcement to enter the residence without a

warrant, and that their protective sweep was appropriate under <u>Buie</u>.  An

appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     November 3, 2021